J-S12039-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES CHRISTOPHER CAREY | : | |
| | : | |
| Appellant | : | No. 1897 EDA 2023 |

Appeal from the Judgment of Sentence Entered March 21, 2023
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0003138-2021

BEFORE: DUBOW, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED MAY 30, 2024**

Appellant, James Christopher Carey, appeals from the judgment of sentence of an aggregate term of 24½-55 years' imprisonment, imposed following his plea of *nolo contendere* to various offenses. On appeal, Appellant contends that the trial court abused its discretion in denying his motion to withdraw his plea of *nolo contendere* prior to sentencing. After careful review, we affirm.

On October 27, 2022, days before a jury trial was to take place, Appellant entered a plea of *nolo contendere* to the following offenses: (1) five counts of involuntary deviate sexual intercourse-victim less than 16 years old, 18 Pa.C.S. § 3123; (2) two counts of statutory rape, 18 Pa.C.S. § 3122; (3) five counts of corruption of minors, 18 Pa.C.S. § 6301(a); (4) six counts of indecent assault-without consent of other, 18 Pa.C.S. § 3126(a)(1); (5) two counts of statutory sexual assault, 18 Pa.C.S. § 3122.1; (6) aggravated

indecent assault-without consent, 18 Pa.C.S. § 3125(a)(1); and (7) indecent

assault-person less than 16 years of age, 18 Pa.C.S. § 3126(a)(8).  At the

plea hearing, the Commonwealth recited the following facts that it would have

established at trial:

> On May 8th of 2020, Officer Renee Fox of the Warminster Township Police Department[,] received a report from an adult male saying that he had been sexually assaulted as a child by a former Warminster Township police officer, [Appellant].  Because the Warminster Township Police Department formerly employed [Appellant], the case was referred to the Bucks County Detectives from the District Attorney's Office to investigate.
>
> On May 13th of 2020, Detective Gregory Beidler and Detective Timothy Perkins, county detectives with the Bucks County District Attorney's Office, were assigned to the investigation.
>
> If called to testify, they would testify to the fact that they are both detectives with the Bucks County District Attorney's Office, [and] both have investigated complex child sexual abuse cases both during their tenure with the District Attorney's Office and previously as detectives with the Bristol Township Police Department.
>
> They would testif[y] to the fact that E.H. was born in 1984 and is currently a 38-year-old man.  In the spring of 2020, E.H. made a report to Officer Fox of the Warminster Township Police Department regarding being the victim of child sexual abuse.  E.H. was using drugs, struggling with suicidal thoughts, and finally found the courage to reach out to Officer Fox because she was a member of the Warminster Township Police Department that he had trusted.
>
> Shortly after reporting being the victim of sexual abuse at the hands of [Appellant], E.H. regretted calling because of the stigma associated with being a victim of this type of crime.  He was embarrassed to know that others would learn about hi[s] being sexually abused as a child.
>
> After initially communicating with Detective Beidler, E.H. stopped answering his calls and was initially unwilling to come in for an interview and communicate with the police.  An investigating

Grand Jury was impaneled, and the case was submitted to the Bucks County Investigating Grand Jury.

In the fall of 2020, E.H. was served with a subpoena to testify before the Grand Jury. After being served, E.H. initially failed to appear and a warrant did issue. E.H. subsequently entered drug rehab, after which he reached out to Detective Beidler and indicated he was ready to testify.

On October 22 of 2020, E.H. testified before the Grand Jury. He testified that as a child he lived … in Warminster Township, Bucks County. He went to Log College Middle School for sixth, seventh, and eighth grades. He started high school at William Tennent High School, and then moved from Warminster Township to … Lancaster County. He graduated from [high school] in Lancaster County.

E.H. has a drug addiction, and despite periods of sobriety, every day is a struggle with his addiction.

E.H. testified that when growing up in Warminster[,] he knew [Appellant] as an officer who took an interest in children, in particular troubled youth. E.H. said that [Appellant] was the D.A.R.E.[1] officer at Log College Middle School when E.H. was a student there.

[Appellant] seemed cool and E.H. saw [Appellant] as a friend and someone he and his friends could trust. [Appellant] would often eat lunch with the students and would be interacting with the students during the day. The students called him O.J. for Officer James or Officer Jim. E.H. thought it was cool that he had a cop as a friend.

E.H. and his friends were in a band together, and they would practice after school. E.H. and his friends also spent time at the Youth WREC Center in Warminster where they would go play basketball or otherwise hang out. They would walk to the WREC Center straight from Log College Middle School.

At times when he was 13 years old, E.H. and his friends would occasionally smoke marijuana in the woods before going to the WREC Center.

---

[1] "D.A.R.E." stands for Drug Abuse Resistance Education.

- 3 -

E.H. said he enjoyed going to the WREC Center after school, but it turned into a nightmare for him. E.H. said that [Appellant] was in charge of a program at the WREC Center, [and ]therefore[] was often at the WREC Center after school when E.H. was there. Other than [Appellant], there was not much staff at the WREC Center.

One day[,] E.H. was in the bathroom at the WREC Center, and [Appellant] was also in the bathroom. Looking back on it, E.H. noted that [Appellant] was often in the bathroom at the same time as E.H. E.H. said he may have dropped a baggie of marijuana but is uncertain if he did, in fact, even have marijuana on him. Either way, [Appellant] told E.H. that he found a baggie of marijuana, and that [Appellant] attributed it to belonging to E.H. E.H. said he started to panic.

E.H. said his dad was alive at the time, and he both respected and feared his dad. Previously, E.H.'s parents caught him and his friends with marijuana, but the fact that a police officer caught him put the fear of God in him.

E.H. said that [Appellant] knew how much E.H. feared and respected his father. E.H. remembers he began to cry and was scared to death. [Appellant] told E.H. that he had to search him. E.H. was just trying to calm down at the door at the time. [Appellant] locked the bathroom door[,] saying that he did not want anyone else coming into the bathroom. E.H. felt that he could not leave the bathroom given that he was now part of a drug investigation.

[Appellant] performed an extremely invasive search of E.H. The pat down started over E.H.'s clothes, but [Appellant] ultimately touched underneath his clothes. [Appellant] also touched E.H.'s butt and genitals with his hand[,] making skin-to-skin contact. E.H. initially thought that [Appellant] must be looking hard for drugs on him. [Appellant] then did the same thing while searching the backside of E.H., and then it was clear that [Appellant] was fondling him in a sexual manner. [Appellant] then performed oral sex on E.H. in the bathroom after the invasive body search.

[Appellant] kept reminding E.H. throughout the search that E.H. was going to jail, but E.H. could avoid jail if he complied. [Appellant] told E.H. he had taken a particular interest in him, and that nobody had to know about what happened.

[Appellant] sexually abused E.H. several times thereafter, each time performing oral sex on him. E.H. said it was approximately

- 4 -

three to five separate times. All of the sexual assaults occurred when E.H. was in eighth grade or during the summer between … eighth and ninth grade. The sexual contact happened more than once at the WREC Center, once in a wooded area near the WREC Center, and once at E.H.'s house when E.H.'s parents were not home. Each time[, Appellant] was in his police uniform.

[Appellant] made E.H. touch [Appellant's] penis with his hand. [Appellant] made E.H. put his mouth on [Appellant's] penis and perform oral sex on him. [Appellant] also licked E.H.'s anus and penetrated E.H.'s anus with his finger multiple times.

One time[, Appellant] showed up at E.H.'s house when E.H.'s band friends were over. E.H.'s band played for [Appellant]. At some point thereafter[,] E.H.'s friends left. Once they were alone, [Appellant] sexually abused E.H. again by performing oral sex on him in his own home. E.H. recalled [Appellant's] asking him if he enjoyed the sexual contact. [Appellant] also made comments about girls not being the answer and suggesting that E.H. should be gay.

E.H. said that he and his band were performing a concert at the WREC Center at the end of the school year when he was in eighth grade. He said that their family and friends were invited to attend. He recalled that his parents were in attendance but had to leave after the band played because they were going out. E.H. and his fellow band[mates] had to stay and clean up and were going to walk home. E.H. was walking home through the path in the woods when he fell behind his friends. [Appellant] caught up to him in the woods, got him alone, rubbed his genitals, and performed oral sex on him.

E.H. described [Appellant] as being smug and arrogant throughout the abuse. After [Appellant] first sexually assaulted E.H., [Appellant] would show up at E.H.'s house uninvited and unannounced. E.H. would see the police car, and E.H.'s dad would ask [Appellant] if there was a problem. When he was told no, E.H. said his dad would just walk right back into the house after talking to [Appellant]. E.H. remembers thinking that [Appellant] trumped even his own father. E.H. remembers thinking [that] his protector, his dad, was just walking away[,] not knowing what [Appellant] was doing to E.H.

E.H. could not tell anyone about the sexual abuse. He did not want anyone to think he was gay. Additionally, he was scared

about being criminally charged for having marijuana on him, [and ]therefore[] never reported what [Appellant] was doing.

When E.H. went to high school the following year, he did not see [Appellant] as often. At the end of his freshman year in 2001, E.H.'s dad died in a tragic motorcycle crash. On the night his father died, E.H. and his family were grief str[icken]. E.H. and his brother, who is two years older than E.H., were drinking outside their home when family and friends gathered to offer condolences to his mother. [Appellant] showed up at E.H.'s house at that time. E.H. believes that [Appellant] must have heard about his father's accident and death through the police radio.

E.H. did not understand why [Appellant] showed up at his house. [Appellant] saw E.H. and his brother drinking and said he would allow it, but told them not to be obvious about it. [Appellant] offered his condolences about … E.H.'s dad. E.H. remembers staring at the ground feeling devastated and disgusted because [Appellant] showed up at his house on the day he tragically lost his father.

When E.H. was in tenth grade, after his dad died, E.H.'s mother started dating again. Since E.H.'s dad was gone, E.H. was no longer in fear and was doing whatever he wanted[,] knowing he would get in trouble. He was using drugs and selling marijuana. E.H. testified that his mom had the police come over and search his bedroom for drugs.

Officers found a blunt with seeds and stems in his bedroom. They also found used condoms in his room. E.H.[,] as a result[,] was arrested and went to … a juvenile detention facility, after the search. E.H. was scared to death [there].

Shortly after he was free from detention, his mom and her new husband moved the family to Lancaster County. E.H. was no longer in [Appellant's] reach. E.H. believed it was the best thing that ever happened to him. E.H. missed his friends and would go back to Warminster on the weekend.

When he was 17 years old[ and] back visiting Warminster, he had a few beers and was driving. He made a wrong turn and [Appellant] pulled E.H. over. [Appellant] made a comment about seeing little E.H.'s sperms when he searched E.H.'s bedroom, the search that ultimately resulted in E.H.'s arrest and detention. He had not known before that [Appellant] was the officer involved in

the search of his bedroom that resulted in his arrest and detention.

[The Commonwealth] note[s] for the record that when we obtained police records, personnel records from Warminster Township, we did, in fact, find that search warrant that was authored by [Appellant] that resulted in E.H.'s juvenile detention.

Other than to the mother of his child and a brief report made to Officer Fox, E.H. had never spoken about the sexual abuse that [Appellant] inflicted on him before testifying in the Grand Jury.

Although E.H. never told his friends about his sexual victimization, he provided names of other friends and band members that he knew [Appellant] spent a lot of time with. He said several are addicted to drugs and some have since died. Therefore, he had concerns about them being victims as well.

Detective … Beidler and Detective … Perkins followed up and interviewed or questioned in Grand Jury those friends and band[mates] who are still alive. One of E.H.'s former band members, someone E.H. had not spoken to in years, is identified as B.E.

On April 12th of 2021, Detectives Beidler and Perkins interviewed B.E. B.E. was born in 1984 and, as mentioned, was a friend and classmate of E.H.

B.E. said[,] growing up[,] his parents were alcoholics and abused drugs. There were often domestic[ issues] at his home that resulted in police response from Warminster Township. B.E. said when he was a child[,] it was widely known among the members of the Warminster Township Police that his homelife was not good.

B.E. said that when he was 13 years old[,] he attended Log College Middle School. [Appellant] was his D.A.R.E. officer. B.E. said that [Appellant] also ran a Friday after-school program for kids at the WREC Center in Warminster Township. He said he was sexually victimized by [Appellant].

He said that he and his friends would always hang out at the WREC Center in Warminster. B.E. recalled[,] one day[,] he was smoking marijuana before going to the WREC Center. He believes [Appellant] must have smelled the marijuana on him. [Appellant] told B.E. and two of his friends that they would be searched. B.E. said his friends were searched in or near the basketball court, but

- 7 -

then he was taken separately and searched privately behind the curtain in the gymnasium of the WREC Center.

During the search[,] [Appellant] reached up the pant leg of the basketball shorts he was wearing and grabbed B.E.'s penis. He continued to search B.E. and found a nickel bag of marijuana in B.E.'s pocket. After he completed the search, [Appellant] kept the marijuana and told B.E. he would speak to him about it later. Nothing further happened that day.

The following week[,] B.E. returned to the WREC Center. As everyone was leaving, [Appellant] told B.E. to wait while he locked up the building. After closing up the WREC Center, they walked to [Appellant's] police car. [Appellant] was in uniform at the time. He told B.E. he would drive him home.

During the ride home[, Appellant] brought up the marijuana that he found on B.E. the previous week. [Appellant] told B.E. he could be arrested, taken out of school, and sent to the juvenile detention center. He said the arrest could follow B.E. his entire life. [Appellant] suggested they could work something out to avoid all this.

[Appellant] then pulled into B.E.'s driveway. The driveway was a long driveway with a view from the neighbor's house that was obscured by large evergreens and fencing.

[Appellant] then removed his gun belt so he could shimmy over to B.E. He lowered the top of B.E.'s shorts and underwear, exposed B.E.'s penis, and put his mouth on it and performed oral sex on B.E.

Early on in their investigation[,] Detective Beidler and Detective Perkins obtained a search warrant f[or] Warminster Township personnel records pertaining to [Appellant's] employment. Records confirmed that [Appellant] was employed … by Warminster Township as a police officer in 1989, having worked the previous years as an officer with Warwick Township.

Records confirmed that he, in fact, was a D.A.R.E. office in the Centennial School District[,] which included working in elementary, middle, and high school[s].

Records further confirmed that [Appellant] ran the Warminster Township Police Teen Activity Corps at the township recreational center.

Records indicate that [Appellant] was fired in 2005, grieved his termination, was later reinstated with retroactivity, and a settlement was reached that he retire with full police credentials in 2009.

Records indicated that [Appellant] possessed retired police credentials up until the time of the investigation, and, in fact, had recently obtained a new ID saying his old one had faded.

Additionally, records confirmed that[,] in 2001[,] there was a criminal investigation into [Appellant's] inappropriate sexual conduct towards a minor male identified as R.B. and his friends.

R.B. was born in 1984. Records were also obtained from the Bucks County Detectives regarding this 2001 investigation. The matter was initially reported by R.B.'s mother to a neighboring police department. Then the matter was referred to Bucks County Detectives to investigate given the potential conflict of interest.

In 2001, detectives from the Bucks County District Attorney's Office -- not Detectives Beidler and Perkins as they were not employed at the time with the District Attorney's Office -- those detectives interviewed R.B., his friends D.P. and B.S., as well as R.B.'s mother.

R.B.'s mother reported that [Appellant] called her son to invite him to an overnight trip to the Poconos. R.B. declined the invitation to go, but told his mother about [Appellant's] unwanted sexual advances. R.B. was interviewed, and he said he first met [Appellant] when he was about 14 years old[,] when [Appellant] was working as a police officer at the Nativity of Our Lord carnival.

At first[,] R.B. thought [Appellant] was just a touchy person but that it was not done in an offensive manner. However, eventually, [Appellant] began talking openly about sex and specifically about having sex.

When R.B. was 16[,] he was working at the 7-Eleven in Warminster Township. At this point[,] [Appellant] moved into a home just a few doors down from R.B. [Appellant] would routinely stop in the 7-Eleven both in and out of uniform.

In June of 2001, [Appellant] stopped by and invited R.B. and B.S. to come over to his house to go in the hot tub with him. They both made excuses not to go. As the summer went on,

[Appellant] stopped by repeatedly and would talk in a sexualized manner to R.B. and invite R.B. into his hot tub.

On one occasion[,] he asked R.B. to go into the hot tub naked. The hot tub invite was always followed with invitations to go to the Poconos. R.B. recalled occasions where [Appellant] made comments about his backside and r[a]n his hand down R.B.'s buttocks over the clothes.

R.B. also recalled that [Appellant] ultimately realized that the 7-Eleven surveillance had both audio and video recording capabilities. Therefore, he would only engage[] in these type[s] of sexualized conversations and invitations when he could find R.B. outside the store.

R.B.'s friends[,] D.P. and D.S.[,] describe witnessing similar conduct by [Appellant] in 2001.

[Appellant] was not arrested at the time. Although R.B. wanted the conduct to stop, … there was reluctance on his part to pursue it further.

Detective … Beidler and Detective … Perkins, as mentioned, were not employed as county detectives in 2001. In their current investigation, they located and spoke to R.B. They learned that he had a struggled youth. R.B. said his father was not very much in the picture, and his mother had substance abuse issues. Therefore, he was living primarily with his maternal grandmother in Warminster when he was a young teen, the time he met [Appellant].

He said once he graduated from high school he joined the U.S. Military, and when stationed in Korea[,] he met and married a woman from Japan. He said he became a father[] and[,] as a result[,] has since settled in Japan where he presently lives. He now teaches English to Japanese students. As a result of the global pandemic[,] … a subsequent FaceTime interview was conducted in lieu of Grand Jury testimony.

R.B. admitted to everything that he reported in 2001. He also admitted that as a teen he was drinking pretty heavily to the point where he clearly had a problem. He said enlisting in the U.S. Military got his life back on track.

Detectives Beidler and Perkins interviewed a good friend of R.B.'s, A.D. A.D. reported and then subsequently testified in Grand Jury

that she was a classmate, neighbor, and very close friend of R.B. Her backyard backed up to [Appellant's] yard. She said she had a direct view into the yard and the area where [Appellant's] hot tub is. However, the actual hot tub was shrouded in blue tarp preventing one from seeing directly in.

She recalled one time[,] when R.B. was a teen[,] she saw him come running from the area where [Appellant's] hot tub was. He came directly over to A.D.'s home. It was clear that R.B. had been drinking. A.D. said R.B. had tears in his eyes. He was upset and told A.D. and her mother that he was in [Appellant's] hot tub when [Appellant] … pulled at his shorts and tried to get them off. He ran out of the hot tub and ran directly over to A.D.'s house because he was so upset.

J.E.B. … reported in 2006[,] as an adult[,] that when he was a teen, [Appellant] touched him in a sexual and unwanted manner. An internal investigation ensued. The records contained a signed written statement from J.E.B. from his 2006 report.

Detectives Beidler and Perkins found J.E.B. in their investigation and reinterviewed him. J.E.B. subsequently testified before the Bucks County Investigating Grand Jury.

J.E.B. was born in 1973. He grew up in Warminster Township, Bucks County, and attended Log College Middle School and William Tennent High School. At around age 15[,] he met [Appellant]. He doesn't recall specifically how they met, but thinks he met [Appellant] after he was getting into some trouble as a teen. He got into some minor trouble with the law mostly involving acts of vandalism.

After J.E.B. and [Appellant] met, [Appellant] would check up to make sure J.E.B. was staying out of trouble. [Appellant] would park his police car outside of J.E.B.'s house when he was on duty. He would call J.E.B. and tell him to come outside to talk. J.E.B. would go outside and talk with [Appellant]. At first[,] [Appellant] would ask about J.E.B. and how things were and make other small talk. Eventually, J.E.B. was invited to hang out at [Appellant's] house. [Appellant] only lived about nine houses away from J.E.B.'s home on Grape Street in Warminster Township, Bucks County. [Appellant's] house was an over-under duplex.

They would play video games in the den. There was a television and a couch in that room. One night after J.E.B. met [Appellant], he and [Appellant] were sitting and playing video games in

[Appellant's] den. [Appellant] got behind J.E.B. and lifted his shirt up to about … shoulder blade height and started drawing on J.E.B.'s back with his finger and asked J.E.B. to guess what he was drawing. This lasted for a few minutes. However, J.E.B. was very uncomfortable and told [Appellant] he was going home. Both J.E.B. and [Appellant] stood up, and J.E.B. went for the door to leave. [Appellant] followed J.E.B. to the door and then put himself between J.E.B. and the door and turned off the light. [Appellant] then tried to run his finger down the waistband of J.E.B.'s pants. [Appellant's] hand went under J.E.B.'s waistband touching his pubic hair. [Appellant] asked J.E.B. to stay a little longer while he was touching J.E.B.'s pubic region. J.E.B. broke away from [Appellant,] pulling [Appellant's] arms away[,] and then ran out the door and left [Appellant's] house running home.

J.E.B. remembers shortly … after this seeing [Appellant] drive by his house about four different times that night. J.E.B. told his mother what happened as soon as he got home. He told his mom that if [Appellant] came by[,] she should tell [Appellant] that he's not home.

J.E.B. was very upset about what happened and believes it only stopped because he pushed [Appellant] away and was able to run away. He never saw [Appellant] again after that night.

J.E.B. did report this incident to the Warminster Township Police Department both when he was a teen and later again in 2006, but nothing ever happened.

In 2006, J.E.B. and his mother found out that [Appellant] had been terminated from Warminster Township, having read about it in the newspaper. Therefore, J.E.B. felt it was safe again to report what happened to the police since [Appellant] was no longer an officer in the township where he grew up and continued to live. Despite being interviewed by detectives, nothing ever came from J.E.B.'s second report. J.E.B. made the report because he was concerned that [Appellant] would do this to somebody else.

When J.E.B. was around 17 or 18, he started hearing rumors about [Appellant]. Specifically, there were rumors in the neighborhood that [Appellant] was trying to touch kids. He told Detective Beidler and Detective Perkins and members of the Grand Jury that there was a rumor that [Appellant] had sexually assaulted a kid identified … in the information [as] J.B., but I'm going to say J.A.B. just for an abundance of clarity. J.A.B. is about two years younger than J.E.B.

- 12 -

J.E.B. was asked if he knew E.H., R.B., B.E., or any other friends associated with these victims. He did not know them. It was apparent that J.E.B. was being truthful when asked this because the same questions were posed to E.H., B.E., and R.B., and they indicated that they did not know one another with the exception of E.H. and B.E. knowing one another.

Of note also is that[,] during the investigation[,] at no point in time was any victim's account referenced[,] nor were their identities revealed when interviewing or questioning other suspected victims. It was not until after the charges were filed and the victims testified at the preliminary hearing that their identities became known to one another.

… C.P. … is the mother of 44-year-old J.A.B. On November 5th of 2020, Detective … Beidler and Detective … Perkins came to her door and asked to speak with her adult son, J.A.B. Her first reaction was fear that her son was in trouble. Without prompting and without having knowledge of their investigation, she proceeded to tell the detectives that J.A.B. has issues, and that she believes they started when he was abused as a child. The detectives told her that J.A.B. was not in trouble. And then she went on to tell them that J.A.B. was abused by a police officer. When asked what his name was, she stated[ Appellant's name]. She told them it was a D.A.R.E. police officer that worked in the schools in Warminster. She said he would come to her house often. She said [Appellant] had a car that identified him as a D.A.R.E. police officer. At this point[,] C.B. broke down and went into her house for a brief period. When she returned, she provided the detectives with [Appellant's] D.A.R.E. business card[,] which had his pager number handwritten on the back.

She said she kept this business card for all these years even before knowing what happened to her son because she always felt something was wrong. C.B. explained that she did not know what happened to her son until about ten years prior.

She said J.A.B. was going through a divorce and was drinking heavily. His drinking was damaging his relationship with his wife. His parents did not understand why J.A.B. was falling apart, and then he told them he was molested by a police officer when he was a child. J.A.B. shared with her some of what happened.

J.A.B. told her that [Appellant] said that no one would ever believe him if he told. [Appellant] told J.A.B. that he is highly respected, and that J.A.B. and his friends have been in trouble before, so no

one would believe them. She said her son did not go into detail regarding the abuse, but rather said he was molested and forced to do things that were wrong.

C.B. said that [Appellant] seemed to have an unusual interest in her son beginning when he was approximately 12 years old. At the time[,] they were living in Warminster, and J.A.B. was attending Log Cabin Middle School. C.B. said that J.A.B. was very happy and well-adjusted, and then all of a sudden became a disturbed child who was angry all the time. She said that J.A.B. started lying, had a lot of anger, was using alcohol, and was sneaking out in the middle of the night. C.B. said her son just did not want to obey her anymore because he lost all trust in people.

C.B. said looking back, she now realizes that this police officer was a significant presence in her son's life. She described that he would drive up in his police car in his police uniform and would drive away taking J.A.B. with him. At the time[,] she assumed he was taking J.A.B. to D.A.R.E. meetings or that her son had gotten into trouble.

She said that as a teen, J.A.B. was getting into trouble, and as a result[,] was mandated to do community service. [Appellant] told C.B. he would handle J.A.B.'s community service. She believed J.A.B. was approximately 13 years old when he was [c]ourt required to do so.

J.A.B. testified in Grand Jury. He is presently 44 years old and was born in 1978. In addition to his mother and father, he has a younger brother and sister. As a child up until approximately age 17, his family resided in Warminster Township, Bucks County, Pennsylvania. He attended elementary school at McDonald Elementary and Willow Dale Elementary and then middle school at Log College Middle School and high school at William Tennent.

[Appellant] and J.A.B.'s family resided in the same section of Warminster Township…. [Appellant] lived approximately three blocks from J.A.B.'s home.

J.A.B. was in the Explorer Program at the firehouse in Warminster. It is a program where young teens who are interested in becoming firefighters could train and do things with adult firefighters. J.A.B. described it as a Boy Scout program, but for firefighting.

As an adult, [Appellant] was actively involved in supervising the Explorer Program in Warminster.

- 14 -

J.A.B. said that between the Explorers, D.A.R.E., and the fact that he lived in the same neighborhood, [Appellant] was always around.

J.A.B. said that [Appellant] first began spending a lot of time with him and his friends when they were about 13 or 14 years old in the seventh and eighth grade. J.A.B. recalled that [Appellant] would let them drive his car in parking lots. He also recalled that [Appellant] would often pay for things for him and his friends. J.A.B. indicated that [Appellant] allowed some of his friends to stay in his home if they needed a place to escape. J.A.B. said he often would go to [Appellant's] house when he was fighting with his parents.

J.A.B. said that he initially thought that the contact … that [Appellant] had with him and his friends was innocent. They thought that [Appellant's] house was a place they could do things they could not do at home. J.A.B. said that [Appellant] let them smoke cigarettes and pot while in his home, and they were also allowed to drink alcohol. He said that [Appellant] provided them with alcohol on a few occasions.

J.A.B. said that what started out as innocent began to change. [Appellant] would make comments about J.A.B.'s body. When he was approximately 13 or 14 years old, [Appellant] made J.A.B. give him oral sex, and [Appellant] performed oral sex on J.A.B. This occurred at [Appellant's] Madison Avenue home in Warminster Township. The sexual abuse progressed in that [Appellant] had anal intercourse with J.A.B., and made J.A.B. have anal intercourse with him.

J.A.B. said he did a lot of stupid things and got into trouble as a young teen. J.A.B. said he was [c]ourt mandated to do community service after being charged as a juvenile with committing crimes. As a result, J.A.B. had to go to court, and the [c]ourt mandated that he perform community service. He initially did some of his community service at the firehouse, but then his community service was monitored by [Appellant]. Since he was a police officer, [Appellant] took it upon himself to supervise J.A.B.'s community service. He would take J.A.B. to his home and engage in sexual acts with him, and deem it community service. J.A.B. said that [Appellant] would hold off on signing the form that certified his community service until the last possible moment in order to have control over J.A.B. so that he could continue to engage in the sexual acts with J.A.B.

J.A.B. said the sexual abuse occurred so many times that ... he has a hard time recalling each distinct time. He recalled that [Appellant] would always start with offering that J.A.B. take a shower and then the physical sexual abuse ensued thereafter.

J.A.B. said that there were times when [Appellant] would pick J.A.B. up[,] while he was working and on shift and in uniform[,] driving his police car[,] where he would take a break from work and would engage in sexual acts with J.A.B. at his home.

J.A.B. described [Appellant's] patrol vehicle as distinguishable from the standard patrol vehicle in that it was a D.A.R.E. car and that it was geared towards children.

J.A.B. said that[,] when he was about 9 years old[,] he found out something personal as it relates to his family, and it was devastating to him. He said he was very angry and upset and confused. As a result, he and his mom had a difficult relationship. J.A.B. said it was something that dominated his thoughts at the time. J.A.B. said that [Appellant] was aware of all of this when he then got close to J.A.B.

J.A.B. said that [Appellant] would threaten to no longer help J.A.B. and his friends when they got in trouble. The fear was a combination of fear of getting in trouble, the fear of [Appellant's] position as a police officer, and later fear of people finding out what was going on that kept him initially from telling anyone. He also explained that he had to protect his mom because her knowing what had happened would have been a burden on her, and he feared she would not have done well with that type of hurt.

J.A.B. said he struggled for years following the abuse. Despite the abuse, J.A.B. said that[,] as an adult[,] he had the perfect life. He had a great wife and described his life as the type that most people would kill for. He said he destroyed it all because of his demons and self-hatred. Towards the end of his marriage, J.A.B. confided in his wife about being sexually abused as a child. He believed that it was in 2009 or 2010 that he told her about the abuse. He said by then it was too late to save his marriage.

He has told a few friends over the years[] and[,] in recent years[,] shared it with his family.

J.A.B. said that [Appellant's] sexual abuse of him began at age 13 and continued for several years. In addition to oral and anal

intercourse, [Appellant] would touch his back, buttocks, and he would make sexual comments about his body.

J.A.B. said he would often be at the WREC Center in Warminster. He would play basketball and attend dances there. He said [Appellant] would always show up at the WREC Center.

J.A.B. said that he believed that [Appellant] was an outsider amongst his colleagues in Warminster.

J.A.B. testified that[,] as an adult approximately 10 to 15 years ago, after drinking and finding the courage[,] he called Warminster Township Police Department to inquire about the statute of limitations. He told the person that he spoke to that [Appellant] molested him when he was a kid. He was told there was a statute of limitations that had expired, and he was unable to prosecute. J.A.B. was uncertain who he spoke to, but recalled it was a male. He initially spoke to someone else who put the call through to a male officer.

Of note again, it was the detectives, the work of Detective Beidler and Detective Perkins that self[-]identified these subsequent victims. These victims were not known to one another with the exception of B.E. and E.H.

N.T., 10/27/22, at 29-68. Following the entry of the *nolo contendere* plea, the trial court deferred sentencing, and it was subsequently scheduled to take place on December 5, 2022.

Prior to sentencing, on November 30, 2022, Appellant filed a motion to withdraw his *nolo contendere* plea. In his motion, Appellant stated — without any elaboration — that "he is innocent of all charges and is requesting to invoke his right to a trial." Appellant's Motion to Withdraw *Nolo Contendere* Plea, 11/30/22, at ¶ 7.

A hearing on Appellant's motion to withdraw took place on January 6, 2023. Appellant testified. He stated that he was incarcerated in the Bucks County Correctional Facility beginning in April of 2021, he has been assaulted

- 17 -

both verbally and physically while imprisoned (including an attack with a razor blade in August of 2022), and he has spent periods of time confined alone without any possessions. N.T., 1/6/23, at 9-15, 21. He said that, at the time he entered the *nolo contendere* plea, his mental condition was "[n]ot very good," he "wasn't thinking clearly[,]" and "just wanted everything to be done." *Id.* at 15. *See also id.* at 16 (Appellant's recalling that, about a week before the trial, he told his attorney he "could not take anymore," and wanted to "make it all stop"). Appellant confirmed that he has always asserted his innocence and has never admitted to any of the at-issue offenses. *Id.* at 15-16. He conveyed that he wished to withdraw his plea because, "I'm not guilty of these crimes, and I want my chance to have it in court and to say that I'm innocent and to have my day of trial and to not let the accusers get away with their lies." *Id.* at 17.

Following Appellant's testimony, the Commonwealth argued that Appellant had not met his burden to withdraw his plea but, in any event, it sought to proffer evidence of the prejudice it would suffer if Appellant was permitted to withdraw his plea. *See, e.g.*, *id.* at 30, 36-47, 59-62. Ultimately, without allowing the Commonwealth to present evidence of its purported prejudice, the trial court denied Appellant's motion to withdraw. *Id.* at 68-69. It concluded that Appellant did not meet his burden to withdraw his plea and stated that it would not need to reach the question of whether the Commonwealth would suffer prejudice. *Id.*

After the January 6, 2023 hearing, Appellant's plea counsel withdrew and new counsel was appointed. On March 21, 2023, the trial court sentenced Appellant to the aggregate term set forth *supra*. On March 30, 2023, Appellant filed a post-sentence motion to withdraw his plea. Therein, *inter alia*, Appellant claimed that his prior plea counsel was ineffective and failed to present significant evidence in support of his pre-sentence motion to withdraw his plea. The trial court subsequently held a hearing, during which Appellant testified that he entered the plea because his prior plea counsel told him that was his "only choice[,]" and that he had to enter the plea that day because he had signed the colloquy paper. N.T., 6/20/23, at 20. Appellant additionally entered into evidence his medical and mental health records that were kept by the Bucks County Correctional Facility during the time he was incarcerated pending his plea. N.T., 6/21/23, at 3-5.

The trial court denied Appellant's post-sentence motion on June 23, 2023. Appellant filed a timely notice of appeal, along with a Pa.R.A.P. 1925(b) concise statement. The trial court later issued a Rule 1925(a) opinion.

Presently, Appellant raises a single issue for our review:

Did the trial court abuse its discretion in denying Appellant's motion to withdraw his plea of *[n]olo [c]ontend[e]re* prior to sentencing?

Appellant's Brief at 2.

With respect to this issue, this Court has previously recognized that:

The following considerations govern the decision to grant or deny a presentence motion to withdraw a plea:

(1) "there is no absolute right to withdraw a guilty plea;" (2) "trial courts have discretion in determining whether a withdrawal request will be granted;" (3) "such discretion is to be administered liberally in favor of the accused;" and (4) "any demonstration by a defendant of a fair-and-just reason will suffice to support a grant, unless withdrawal would work substantial prejudice to the Commonwealth."

*Commonwealth v. Norton*, … 201 A.3d 112, 116 ([Pa.] 2019) (quoting *Commonwealth v. Carrasquillo*, … 115 A.3d 1284, 1292 ([Pa.] 2015)). A fair and just reason exists where the defendant makes [a] claim of innocence that is at least plausible. *Carrasquillo*, 115 A.3d at 1292. "Stated more broadly, 'the proper inquiry on consideration of such a withdrawal motion is whether the accused has made some colorable demonstration, under the circumstances, such that permitting withdrawal of the plea would promote fairness and justice." *Norton*, 201 A.3d at 120-21 (quoting *Carrasquillo*, 115 A.3d at 1292). "[T]rial courts have discretion to assess the plausibility of claims of innocence." *Id.* at 121.

*Commonwealth v. Garcia*, 280 A.3d 1019, 1023 (Pa. Super. 2022) (footnotes omitted; some brackets added). We further acknowledge that "[a]n abuse of discretion will not be found based on a mere error of judgment, but rather exists where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Norton*, 201 A.3d at 120 (citation and quotation marks omitted; some brackets added). "Thus, a court's discretion in ruling on a presentence motion to withdraw a guilty plea must be informed by the law, which, for example, requires courts to grant these motions liberally, and to make credibility determinations that are supported by the record…." *Id.* at 121 (citations omitted).

Here, in denying Appellant's motion to withdraw, the trial court observed that Appellant's assertion that he was not of the right mind when he entered the plea "is contrary to everything that was stated on the record at the time of the … plea[,]" and it deemed this assertion by Appellant to be incredible. N.T., 1/6/23, at 67-68. In addition, the trial court noted that Appellant "has done nothing more than assert his innocence[,]" which the court said does not meet his burden under the case law to permit withdrawal. *Id.* at 68. It also found Appellant's assertion of innocence to be "insincere" and stated that Appellant "was merely asserting his innocence in an attempt to be released from prison because he was unhappy with his living conditions." *See* Trial Court Opinion ("TCO"), dated 9/7/23, at 17. As for Appellant's later claim that his plea counsel was ineffective, the trial court concluded that Appellant should seek relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. *See id.* at 19.

On appeal, Appellant argues that he "presented fair and just reasons for seeking to withdraw his … plea prior to the imposition of sentence, namely that he was innocent of the charges and that he was laboring under psychological stress which rendered him incapable of tendering a knowing[,] voluntary plea of *nolo contend[e]re*…." Appellant's Brief at 5. He says the trial court failed to consider that presentence motions to withdraw are liberally allowed, *see id.* at 5, 9, and insists that his "claim of innocence was even more plausible when viewed against the quality of decades-old, uncorroborated evidence offered by the Commonwealth, resting chiefly on the

childhood memories of victims." *Id.* at 9. He also asserts that "nothing in the oral or written plea colloquies squarely addressed Appellant's mental state at the time of the plea." *Id.* Finally, he points out that he filed his motion to withdraw four weeks after his plea was tendered and one week before sentencing, which he says suggests no gamesmanship on his part. *Id.*[2]

No relief is due. Initially, with respect to Appellant's claim that his mental decline hampered his ability to knowingly and voluntarily enter the plea, we discern no abuse of discretion by the trial court in discrediting this assertion. At the oral plea colloquy, *inter alia*, Appellant represented that he understood that the Commonwealth had the burden of proof, that he would be presumed innocent if he proceeded to trial, and that he has a right to remain silent and does not have to present any evidence. N.T., 10/27/22, at 26. He confirmed that he and his counsel went over all the maximum and mandatory minimum sentences in this case. *Id.* at 27. He verified, twice, that he was entering the plea of his own free will and that no one was forcing him to do so. *Id.* at 27, 28. In addition, he stated that he was not under the influence of any drugs or controlled substances that would make it difficult for him to understand what he was doing. *Id.* at 27. He said he was satisfied with the representation of plea counsel and that he had enough time to talk with them. *Id.* at 28. He conveyed that he had no questions for the judge,

---

[2] In Appellant's argument, he does not mention any purported ineffectiveness on behalf of his plea counsel, nor does he allege that his plea counsel forced him to enter the plea. Accordingly, we do not address those claims further.

or his plea counsel. ***Id.*** at 28-29. In its opinion, the trial court noted that Appellant "had no trouble answering questions…." TCO at 17.

Further, the written plea colloquy — signed by Appellant and dated October 24, 2022 — specifically asked Appellant about mental illness. ***See*** Plea Hearing Exhibit D-1.[3] Appellant provided the following answers, in relevant part:

7. Have you ever been a patient in a mental institution or have your [*sic*] been treated for mental illness?

YES____ NO_x__

8. If the answer to Question #7 is YES, please explain the details:

N/A

9. Are you now being treated for mental illness?

YES_x__ NO____

10. If the answer to Question #9 is YES, [p]lease explain the details[:]

Anxiety, Depression

11. If the answer to Question #9 is YES, do you still feel you can understand what you are doing today?

YES_x__ NO____

12. If the answer to [Q]uestion #9 is YES, are you under the influence of any medications or drugs which would affect your ability to understand these proceedings?

YES____ NO_x__

_____

[3] The written plea colloquy was entered as Exhibit D-1 at the October 27, 2022 plea hearing. Though it was not initially transmitted to us with the certified record, we were able to obtain it after making an informal inquiry with the trial court.

Plea Hearing Exhibit D-1 at 2-3.

Thus, based on the oral and written plea colloquies, the record supports the trial court's finding that Appellant was capable of tendering a knowing and voluntary plea. *See Norton*, 201 A.3d at 121 (citing *Commonwealth v. Myers*, 722 A.2d 649, 652 (Pa. 1998), for the proposition that "when appellate review involves the trial court's findings of fact and credibility determinations, those findings are binding on the reviewing court if they find support in the record"). As such, we discern no abuse of discretion by the trial court in rejecting Appellant's claim that he should have been permitted to withdraw his plea due to the psychological stress he was under at the time he entered it.

Next, regarding Appellant's assertion of innocence, we likewise discern no abuse of discretion by the trial court in denying his motion to withdraw on this basis. As stated *supra*, in *Carrasquillo*, our Supreme Court concluded that "a defendant's innocence claim must be at least plausible to demonstrate, in and of itself, a fair and just reason for presentence withdrawal of a plea." *Carrasquillo*, 115 A.3d at 1292. The Court explained that, "[m]ore broadly, the proper inquiry on consideration of such a withdrawal motion is whether the accused has made some colorable demonstration, under the circumstances, such that permitting withdrawal of the plea would promote fairness and justice." *Id.* It considered the timing of the innocence claim, as well as the Commonwealth's evidentiary proffer at the plea hearing, relevant to assessing whether a trial court acted within its discretion in ruling on the

motion to withdrawal. ***Id.*** at 1292-93. The Court instructed that "[t]he policy of liberality remains extant but has its limits, consistent with the affordance of a degree of discretion to the common pleas courts." ***Id.*** at 1292.

Later, in ***Norton***, the Court shed more light on ***Carrasquillo's*** holding. In ***Norton***, on the day of jury selection, the defendant pled *nolo contendere* to one count each of indecent assault and corruption of a minor. ***Norton***, 201 A.3d at 115. Roughly four months after the entry of the plea, prior to sentencing, the defendant filed a motion to withdraw his plea. ***Id.*** In his motion, he "asserted his innocence and proclaimed that he could not live with himself for taking a plea under the circumstances." ***Id.*** At a hearing concerning the motion to withdraw, the defendant repeated that he "wanted to withdraw his plea because he was innocent of the crimes to which he pleaded *nolo contendere* and because he could not live with himself for entering his plea." ***Id.***

The trial court ultimately denied the defendant's motion to withdraw, and our Supreme Court affirmed. In doing so, the Court explained:

> Turning to the circumstances of this case, in support of his presentence motion to withdraw his plea of *nolo contendere*, [the defendant] asserted in the trial court that: (1) he is innocent; (2) he cannot live with himself for taking a plea; and (3) he wants to test the Commonwealth's evidence at trial. Simply put, the last two assertions add nothing to the first. [The defendant's] contention that he could not live with himself for entering his plea is self-serving makeweight and does not add any substantive support to the plausibility of his claim of innocence. [The defendant's] desire to test the Commonwealth's evidence at trial is equally non-substantive. Generally speaking, trials are always proceedings in which the parties test each other's evidence, and

- 25 -

[the defendant's] belated wish for a trial fails to bolster his claim of innocence, particularly in light of the fact that any vulnerability in the Commonwealth's evidence, specifically [the v]ictim's testimony, was well known to [the defendant] prior to him entering his plea. In other words, for all intents and purposes, the reality is that [the defendant] solely asserted his innocence in an attempt to withdraw his plea presentence.

The trial court was intimately familiar with this case, having observed [the defendant] throughout the various trial court proceedings. Additionally, the court demonstrated a studied understanding of the law in this area. For example, the trial court appropriately assessed the plausibility of [the defendant's] contentions supporting withdrawal of his plea when it considered the timing and entry of the *nolo contendere* plea, which occurred in chambers while a prospective jury pool waited in the courtroom. The trial court also properly factored into its exercise of discretion [the defendant's] knowledge of his available defenses when he pleaded and then inexplicably waited four months to file his motion to withdraw his plea.

*Id.* at 121-22. In conclusion, the **Norton** Court ascertained that "the clear standard articulated in **Carrasquillo** establishes that the trial court acted within its discretion when it denied [the defendant's] motion on the basis that his bare assertion of innocence was not, in and of itself, a sufficient reason to require the court to grant [the defendant's] presentence motion to withdraw his *nolo contendere* plea." **Id.** at 122.

Like the defendant's assertion in **Norton**, Appellant's claim of innocence in the case *sub judice* is also bare and non-substantive. While Appellant filed his motion to withdraw only a few weeks after his plea and a week before sentencing, in both his motion to withdraw and at the January 6, 2023 hearing, Appellant essentially stated that he is innocent and wants to have his day in court. **See** Appellant's Motion to Withdraw *Nolo Contendere* Plea, 11/30/22,

at ¶ 7 (asserting that "he is innocent of all charges and is requesting to invoke his right to a trial"); N.T., 1/6/23, at 17 (Appellant's stating: "I'm not guilty of these crimes, and I want my chance to have it in court and to say that I'm innocent and to have my day of trial and to not let the accusers get away with their lies."); *see also id.* at 15-16 (Appellant's agreeing that he has always asserted his innocence and has not admitted to any of these offenses). He provided no further explanation for his claim of innocence nor any evidence in support of it. In contrast, at the plea hearing, the Commonwealth provided a lengthy, detailed recitation of the facts it said it would elicit to prove the at-issue charges against Appellant if the case went to trial.[4] To the extent Appellant now argues that the Commonwealth's evidence is "decades-old[ and] uncorroborated[,]" Appellant's Brief at 9, he does not contend that he

---

[4] *Cf. Garcia*, 280 A.3d at 1026-27 (determining that the defendant made more than a bare assertion of innocence where he introduced into evidence the preliminary hearing transcript, and argued that a plausible-consent defense existed, as the victim had permitted the defendant into her apartment one week prior to the alleged sexual assault despite having a Protection from Abuse order against him; in addition, the Commonwealth did not develop a record in opposition to the plea withdrawal); *Commonwealth v. Islas*, 156 A.3d 1185, 1191 (Pa. Super. 2017) (concluding that the defendant's assertion of innocence was plausible where, at the hearing on his motion to withdraw, the defendant "testified that: he did not engage in the charged conduct; he had maintained his innocence when interviewed by law enforcement; had the conduct occurred as alleged, it would have been witnessed by other campers and counselors in the cabin at the time; the victim had a motive to fabricate the charges; the victim had delayed in reporting the first incident; and [the defendant] was of good character, had no criminal record, and had never received a similar complaint in the many years he had been working in the field[,]" and that "his new counsel had explained to him, as prior counsel had not, his available defenses, including his ability to call character witnesses on his behalf") (citations omitted).

did not know of these purported weaknesses in the Commonwealth's evidence at the time he entered his plea. Accordingly, based on the foregoing, we discern no abuse of discretion by the trial court in denying Appellant's withdrawal motion on this basis either.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/30/2024